Good morning, your honors. May it please the court. My name is Richard Mazur. I am counsel for Appellant Sully in this case. Appellant submits that this court must vacate the order granting summary judgment and remand the case to the district court for a full and fair evidentiary hearing on the issues involving ineffective assistance to counsel and the defendant's competency in the case. These are claims 3, 4, 5, 9, and 11 in the habeas petition. We submit that the district court applied the wrong standard, never applied the correct standard for determining whether Mr. Sully was entitled to an evidentiary hearing. The correct standard as set forth by this court is set forth in Earp v. Ornosky. And this, our case, like Ornosky, is a case where the defendant has raised colorable claims for relief and has never had an evidentiary hearing in state court or federal court. And his state habeas petition was denied by the California Supreme Court in what is called a postcard denial, which gave no reasons or factual findings for the denial. The test of establishing a colorable claim is a rather low bar, as Earp v. Ornosky recognized. And the test is whether the defendant has alleged facts which, if proven, would entitle him to relief. This is clearly a lesser standard than making a decision on the merits of the ineffective assistance to counsel arguments under Strickland. This is just the standard to get an evidentiary hearing, to develop the claims and facts that support those claims. In the district court's order, the court never mentioned the term colorable claim, never mentioned cases that cite, that stand for that proposition, that a colorable claim is all one needs to allege where one has never had an evidentiary hearing in state or federal court. There is ample evidence set forth in the habeas petitions to support that we met the relatively low threshold of sending forth a colorable claim for relief on each of the habeas issues revolving ineffective assistance to counsel and competency. It is the law that in granting summary judgment, as the judge did here, the judge must not make credibility findings. The judge has to take the allegations in the petition at face value, assume them to be true. But in this case, the district court judge made a number of credibility findings against the petitioner's evidence. First, he attacked the opinion of our psychiatric expert on the grounds that the psychiatric expert had seen Sully a number of years after the case and these post, these retrospective analyses are disfavored, according to the judge. But in doing so, the judge ignored that our expert was also relying upon evidence of mental illness, drug abuse, and incompetency that was contemporaneously took place contemporaneously at the trial. For example, the trial counsel hired a psychiatrist named Dr. Grossi to not to perform a forensic evaluation, but to treat Sully during and before the trial so that Sully kept his composure, that Sully kept a lid on him, keep a lid on Sully is the way that Dr. Grossi was told to operate. So for 16 months, both before and during the entire trial, Grossi observed Mr. Sully, saw him at least 50 times for a total of approximately 150 hours, and in the course of that observed symptoms of major mental illness. Now, in this case, none of that was ever investigated by trial counsel. In fact, trial counsel, the record shows, met with Mr. Grossi, Dr. Grossi one time, and that was when he was hired to keep a lid on Mr. Sully's behavior. So he never, trial counsel never consulted Dr. Grossi, even though here was contemporaneous evidence of major mental illness and that the amount of freebasing cocaine Sully had done resulted in cocaine psychosis. He did not investigate it. You would agree with me, however, wouldn't you, that Dr. Grossi, I said Grossi, I'm not sure that's exactly how you say his name, never opined that the petitioner was incompetent, that he never opined, never says that he was delusional or even seriously delusional, and that he doesn't say that he was ever in complete denial? I'm sorry, I missed the last part of that, sir. Was never, that he never said he was in complete denial? Well, there was evidence from Dr. Grossi of symptoms of major mental illnesses, which include, included delusions, which included the fact that he had, there was evidence of memory loss from the, from the cocaine, both in Dr. Grossi's observations as well as what Sully told the police when he was arrested, that he suffered from periods of blackouts and suffered from, had used cocaine to great abuse, and when he was asked the specific question, have you ever done anything bad under the influence of cocaine, he said, not that I know of, which is not a no. The evidence is, here's what our point is, our point is, we're not talking about the merits of this case at this point, Judge, we think the merits to decide this case is premature. What we're saying is, under the clearly established Supreme Court law, the duty to conduct sufficient investigation before you make decisions is what the trial lawyer has to do. The trial lawyer cannot say, I made a strategic or a tactical decision without having done the investigation. But the evidence about what was the investigation really comes from your affidavit from Mr. Bollier, right? There's, well, that's what we have. We have evidence. We have Mr. Bollier's affidavit, and Mr. Bollier, in ER 537, says, I did not even participate in the preparation of the penalty phase. It says I didn't even become counsel until four months before trial. It would seem to me that that's hardly a case for failure to investigate on an affidavit just that good. The record's silent, Your Honor. The record is silent whether this man, the trial counsel, did any investigation at all with regard to the areas we're talking about, with regard to mental health, with regard to the effects of freebasing cocaine, with regard to the question of competency. The evidence is simply barren. So I don't think one can assume that based upon the evidence. or that the record is barren because of the defense undertaken. The defense undertaken is not to suggest that this particular, these particular allegations are necessarily wrong, but the defense undertaken by counsel was,  regardless of the fact we have used drugs and these drugs are bad, we're going to hire the best person we possibly can, and we're going to suggest it doesn't make any difference. We couldn't have committed the murders. Could not have prevented. Could not have committed the murders. I mean, that was the defense. The defense is, I'm innocent. And all of this drug treatment or drug problem is not, would not have caused this. Well, Your Honor, there's, there's, my answer to that is twofold. First, this is an important, the court puts this finger on a very important point that the district court made. And the court italicized this portion of its opinion in which the court said, the decision by petitioner to claim factual innocence and to bolster the petitioner's testimony with the testimony of Dr. Cohn necessarily limited the mitigation investigation that had to be undertaken. The problem with that, there's two problems with that. First, the court has lumped together two discrete decisions. The defendant's right to testify and the decision by counsel to call an expert witness. Petitioner did not have control of what expert witnesses were called by the defense. That's the lawyers, Bailey Wink. And what happened here is that yes, trial counsel called Dr. Cohn, but Dr. Cohn did no investigation with regard to the effect of drugs on Sully. He never examined Sully. He never prepared a forensic report or any kind of report. He never looked at any of the evidence. He testified purely in the abstract and never mentioned Sully's name during that testimony. Well, I understand your point that you're arguing in terms of lack of investigation, but maybe I may have the same question as Judge Smith, and let me see if I can put it a different way. Let's assume that the table has been set in the sense that we have the evidence at guilt phase. Given the strategy at guilt phase, if you accept that as a given, and I'm assuming that you're not from your answer that you think something else should have been taken, but let's take the strategy as a given. Then what could have been done at the penalty phase in terms of cocaine psychosis? What options were available? And do you agree with the district court that the guilt phase strategy necessarily controlled what was going to happen in the penalty phase? I think, Your Honor, in order to answer that question fully, one needs to look very carefully at the testimony of Dr. Cohn and compare what Cohn testifies to in the abstract at this trial under very careful questioning by the defense lawyer, compare it with the writings that he has done on these subjects at the time of Sully's trial. And his writings, which are contained in our psychiatrist's declaration with citations to Dr. Cohn's writings, rebut everything he said at trial. His trial, his testimony was downright misleading because it never took into account the quantities of drugs, never asked the quantities of drugs, the frequency of use of drugs, the method that he was using drugs, freebasing, which is the most severe, the period of time, didn't take into account the physical and mental deterioration and business deterioration that Sully suffered when he fell in to this cocaine matter. The court has to keep in mind that when Mr. — when the trial counsel got this case, here's what he's presented with. Here's a guy who has no serious criminal history. He served in the Coast Guard honorably. He was a police officer for seven years in the Millbrae Police Department. He left to start an electrical contracting business, which was quite successful until at the age of 38, he fell in with a group of pimps and prostitutes and he started freebasing cocaine. And that changed everything. So the — Counsel, as I have looked at the record and contemplated things, what defense counsel wanted out of Dr. Cohen was what he got, which was a general statement that someone under the influence of cocaine couldn't have involved — done the planning that was required in this case. So he got that out of him. And also that ordinarily it didn't lead to violence. And those were the two things he wanted out of Cohen. He didn't really want any comment on anything else as I understand it. And I don't know why Cohen quite went along with that, but he apparently subscribed to those two general propositions, which then bolstered the defense was this guy was incapable of these murders. Judge, what I can tell you is that Cohen's own writings — I understand that. — disavow all of that. And what happened is, it seems to me, that in order to have made — in order to — before he — the Court made that decision — excuse me — before trial counsel made that decision to call Mr. Cohen as a witness, he should have done enough investigation to know, A, that Cohen's own writings refute that, that that is — the testimony he was asking him to give was highly misleading, and, two, what the effects of the amount of cocaine that Mr. Sully was doing. I mean, he has to do that foundational investigation before he gets to make that decision. You cannot do — you cannot not investigate the issues that jump out in a case by simply saying, well, the guy's going to testify. We'll support it this way. You have — the essence of what's wrong in this case is the informed investigation would have painted a different picture and maybe would have resulted in trial counsel not calling Dr. Cohen, because in the process of calling Dr. Cohen, he really took one of the major mitigating, statutory mitigating factors out of the case. I mean, this is a — the — what else explains the change in Mr. Sully's behavior? Up to the age of 38, he had lived a law-abiding and productive life. Then he falls in and is freebasing huge amounts. The record is absolutely clear. This is not a guy who's socially or recreationally using a little cocaine, which is the image that is left by Dr. Cohen's testimony. He is in a blizzard. He's in a cocaine blizzard. And also, at the same time, the lawyer has — knows Sully's got mental problems. That's why he hires Dr. Grassi to keep — to keep a lid on him so he does not react during the trial. Doesn't even — there's no evidence that he won — that the — excuse me. There's no evidence that Gray even talked to Grassi about what he had learned over this 150 hours that he sat and had entreated Mr. Sully. He did — trial counsel did nothing. He put the cart before the horse. He made a decision on what the trial strategy was going to be without adequate investigation. What do we know about Sully's insistence that the defense be, I didn't do it? We know nothing of that. We don't know anything. We don't know that he insisted on that. Now, he ended up testifying. We know that. But even if he insisted, it doesn't — it doesn't excuse. Because here's — here's the — here's — But because the lawyer had done adequate investigation into both the effect of cocaine and the mental illnesses that Sully suffered from and their — their combined effect, he could argue, credibly, Sully may have said he didn't do it. But what he really means is what he told the police. Did you ever do anything bad under the effect of drugs? It's not that I know of. And the — and the literature is powerful, that under cocaine psychosis, people commit acts of violence, including murder. So what — to answer your question, Your Honor, what he could have done is he could have put Sully on the stand to testify, not called Cone, because his investigation would have revealed that he's going to — that there is massive mitigating statutory evidence. He's got mental illness and drug use as two statutory mitigating factors in the state of California that he completely ignored. Let me ask you a question. What's your best case for the idea that counsel hires a great expert to come forth and, if you will, convince the jury, in an effort to convince the jury, that the petitioner's testimony is correct, that the effect of his cocaine use, though an admitted addict, is not what — is not what the state would suggest, and therefore he is absolutely innocent, and then come back later on with another expert who goes into the testimony of the expert who appeared at trial and tries to say, based on his expertise, that that expert was not telling the truth, didn't do what he had to do, and now we should give an evidentiary hearing as to that theory? What's your best case? I don't — I don't — I don't posit that as actual — as what I'm thinking about, what should have been done. Well, that's what I hear your argument suggesting. Well, then maybe I've not been clear enough, sir. What your argument is suggesting that, because you have a psychologist hereafter who wants to go through Dr. Cohen's writings and suggest that the testimony he gives is misleading, is not the way it ought to be given, and because he comes in and gives the district court that testimony, that that should automatically entitle your client to a hearing? No, sir. That's not my argument at all. Okay. What is it? My argument is that before the lawyer made that decision to call Dr. Cohen, and in so doing ended up giving up and turned the — mitigate — the powerful mitigating evidence of his cocaine use and turned a statutory mitigating factor into an aggravating factor, as argued by the prosecutor in closing argument. Before he made that decision, he should have done enough investigation to know whether that was — what the effects of cocaine were. He has an independent duty to do that, and he didn't do any of that. And calling Dr. Cohen has — reflects no investigation at all. All it — because this is an abstract abstraction that he put Dr. Cohen on, and by the nature of the questions he asked, which really were very misleading with regard to the facts of the case, quite frankly, were highly misleading, he ends up taking this potential powerful mitigating factor and turning it into an aggravating factor, and that's because he had not done his homework. He hadn't done enough investigation to know. Counsel, if we were to set the guilt phase aside and look only at the penalty phase, given the strategy which was employed at the guilt phase, what restrictions do you think are imposed on counsel? Counsel seemed to think that he was — his hands were tied and that he couldn't at that point turn to showing that the guy was mentally completely disabled. Well, I don't see — I don't understand that. Your Honor, I think that he burned the cocaine at guilt phase. He did that. And we say he did that without sufficient investigation. But still, the stuff about mental illness and was still available as a statutory mitigating factor, never investigated it, didn't investigate any of that. And the court — he still could have used the cocaine to the extent that it shows how it — how the use of cocaine exacerbates the mental — the symptoms of mental illness, so that the — he still would have some use of the cocaine that Mr. Sully was using, but it would be in the context of how it acted upon the mental illnesses and the symptoms of mental illnesses that were observed. But he didn't do any investigation. There's no mental health investigation at all in this case. I understand. No. Well, but you're really not quite answering my good colleague's question. I mean, what she said is, let's get past this. Let's go to now the penalty phase. And even if assuming that there was failure to investigate the beginning, now here we are. We're at the penalty phase. And we have an expert who suggests that everything that was done was right, that everything that was — the way the defendant testifies is absolutely consistent with the evidence that I know. And he comes on and he forecloses this possibility. Then the defendant gets up and testifies. The defendant pursues a defense of complete innocence. The defendant testifies at length at trial. The defendant — I read his testimony. He's composed. He's coherent. He denies his guilt. After all of that, now we're at the guilt phase, and it seems to me that the district judge is correct. If you come in at the guilt phase and start talking about — But the penalty phase. Thank you, Judge Fletcher. If you talk about the penalty phase, it would be duplicitous to the extreme to come in with that. I don't think so, Judge, because part of the mental illness problems, the symptoms that were apparent to Dr. Grassi at the time of the trial, talked about paranoia and delusion. And a person who is acting under paranoia and delusion can testify seemingly in a competent fashion, but the subject matter of what his testimony is, this is based upon a delusion or based upon a paranoid ideation. But isn't that exactly what Nolan says? Nolan says, and in a little bit different — in a little bit different situation, but in fact it seems to me that your expert says the introduction of Cohen now being mentally disabled is removed as a possibility for mitigating evidence at the penalty phase. That's your own expert. The cocaine was essentially removed. The mental illness, Your Honor, I think there's still an argument to be made that one can make a cohesive argument about using the mental illness as a mitigating factor and still do justice to the jury's verdict. One could say to the jury, we're not quarreling with what you did. We're not saying you found — you said Sully did it. He said he didn't do it. We honor that. But nonetheless, there's explanations of why he did it. And that is where the mitigating factors come in to explain why he did it and why he is not a person who should be subject to the death penalty. And there was none of that. There is — the penalty phase here is very generic. The closing argument is very generic. There was really very little done for Mr. Sully when there was a wealth of materials available. And my final point, Judge, is that the trial lawyer settled on a strategy without having done enough investigation. Cases are legion that that is not a reasoned tactical decision. You can't make a tactical decision without investigation. And it was the lawyers calling Dr. Cohn. That was the lawyer's decision. Sully could testify if he — assuming he desired to testify. Of course he could testify, as he did. But there is still — can't — there's still the way that case could be presented without burning all of the drug stuff, the drug mitigation, in a way that, as I say, baffles me. I mean, when one reads that testimony and compares it to other writers in the field, as well as Dr. Cohn, it's highly misleading and completely irrelevant to the cases — to the facts of the case here. Thank you, Counsel. Thank you, sir. May it please the Court, Greg Zewicki for Respondent. Six brutal murders. That is why we are here today. That is why Mr. Sully cannot show prejudice. And particularly, that is why the California Supreme Court, as well as the district court in this case, were permitted to deny the petition on the merits without resort to an evidentiary hearing. Moreover, that is why the decision of the California Supreme Court is reasonable under Section 2254. Well, Counsel, the district court said in its findings that the evidence on the mental condition was equivocal. Correct, Your Honor. So that certainly equates with colorable, unless you're telling me that there was no capacity to inject the mental condition at the penalty phase. Your Honor, I believe what the — the way the district court used that phrasing of equivocal was that it simply was not powerful enough to overcome anything that would have been presented because of the brutal nature of these six murders. That's not the meaning of equivocal. Equivocal, I assume, means equally balanced. But that is not necessarily the test for whether the district court in this particular case could deny the petition without resort to an evidentiary hearing. Colorable is the standard. Correct, Your Honor. Colorable includes both the deficient performance prong of Strickland, as well as the regardless of whether or not Counsel was or was not deficient in this case. Mr. Sully, because of the brutal nature of these six murders, cannot meet either the prejudice prong or the unreasonable application prong. Now, the true — Did you have — did you have an expert to counteract Nolan's declarations? Your Honor, we have not presented any declarations in this particular case. However, we do not believe that is necessary. The California — It's just kind of a yes or no question. You didn't. No, Your Honor. Okay. However, the California Supreme Court is the ultimate arbiter of attorney conduct in California. They are the body that governs what is and is not deficient performance. And even though Thomas Nolan can come in and say, I don't think this was deficient performance, the California Supreme Court can, in light of the overwhelming nature of the aggravating evidence here, say that is not the issue. The issue is whether Mr. Sully can prove prejudice. So are you conceding that there's a culpable case to be made of ineffective assistance of counsel without — and relying solely on the prejudice prong of Strickland? No, Your Honor. We are not actually conceding that. We seem to be. What I am suggesting, Your Honor, is that in denying the petition on the merits, the California Supreme Court may not have needed to reach the merits of deficient performance prong. Strickland itself suggests that if — if the claim can be denied on the basis of lack of prejudice, the merits of an attorney's performance need not even be adjudicated. And we submit that that's probably what happened here, although — We don't know. We don't know. We do not know, Your Honor. We do not know which prong the California Supreme Court used to adjudicate this when it simply denied the petition in a single word or in a single line. However, we can infer that the Supreme Court at the very least made whatever factual findings were necessary to support its legal conclusions. And deficient performance, as well as prejudice, are legal conclusions. And in this particular case, there were very few factual determinations that were necessary due to the fact that not only had Mr. Sully killed six people, but the true character, his penchant for violence, was revealed in the aggravating evidence. The only aggravating evidence that people put on at trial, in addition to the guilt phase evidence, was the fact that in 1975, 7 years before Mr. Sully had ever abused cocaine, before he had ever killed anyone, he ripped the heads off his daughter's baby ducklings on the night he separated from his ex-wife. He then taunted her with phone calls saying, I'm going to kill you, I'm going to kill your daughter, and I know how to get away with it because I was a police officer. He never acted upon that, however, beyond killing the ducks. Correct, Your Honor. But hearing — But doesn't that go to show that mental illness was the only possible penalty phase defense in this case? No, Your Honor. And it was not presented? I mean, what penalty — what you're basically saying is there's just no hope in this case at all. There's no defense that could have been presented at all. Your Honor, I'm saying that some — In Strickland, as well as in a number of cases from this court, the courts have found that the overwhelming nature of the aggravating evidence itself is simply too powerful to be overcome. This is one of those cases. This is Raley. This is Gerlaw. This is Bonin. This is Babbitt. This is Allen, where the body count, the egregious nature, the shockingly evil nature of the offenses is by itself so powerful that it really doesn't matter what was put on in terms of the penalty phase. Are you suggesting that there can't be a defense of mental illness to the — even the most heinous of crimes? The more heinous the crime, the more likely of real mental — Your Honor, I'm not suggesting that that is not a potential defense. Right. I would not agree with the Court, however, in suggesting that the more heinous the crime, the more likelihood of some type of mental disturbance. There may be a personality disturbance, a sociopathic disturbance, an inability to get on with anybody else. And in this particular case, I believe the district court quoting Dr. Elin's report suggested that Mr. Sully suffered from no actual mental impairment, but instead he simply had rage and explosive impulses, and he felt no remorse here. He had no history of psychiatric problems or mental health problems at all. What's your best case for the idea that — I mean, the biggest challenge I have is the inadequate evidence that counsel ever, ever looked at incompetency prior to the guilt phase of the trial. And if that be the case, it seems to me that with the minor, I say minor, amount of evidence necessary for hearing, how do I get around the idea that one ought to have done something to either assist or present incompetence to stand trial or failing to request competence at proceedings, or that is even incompetent to stand trial, without going to what you want us to go to, which is the prejudice prong? Your Honor, there are, I believe, two parts to that answer. First, under 2254, it is the defendant's burden in this particular case to show any evidence that counsel was deficient, counsel's performance was deficient. We do not have that evidence here. We have a declaration from Mr. Balliet that says it wasn't my job to determine these things, and I was simply unaware of what was done. Yes, we have a declaration of Thomas Nolan saying I would have done things differently, but that is simply a strategic choice. My best case in this particular aura is Strickland itself. In which the Court said that the defendant's actions can and should inform the choices that defense counsel makes. Now, again, we're not sure whether counsel actually investigated to the extent that Mr. Sully asks defenses of mental illness. However, Mr. Sully specifically testified, and he testified about two different things here that informed counsel's choices. First, yes, he stood up and proclaimed his innocence. The jury did not believe that, but that's what he did. And as the district court found, any type of mental health defense which said I did it, but please excuse my conduct, would have been duplicitous in the extreme. Now, the second part of that, Mr. Sully not only testified to his innocence, he also testified as to the way he felt under the influence or the way he acted under the influence of cocaine. And a mental health defense presented at the penalty phase, again, would have been directly inconsistent with that. He said there's no psychosis here. I remember what happened. I know what happened. Yes, I was high for a little while, and then it just went away. And there I was, not high anymore. But I still remember exactly what happened. Mr. Sully on cross-examination in this case said I controlled everything that went in and out of this warehouse. Yes, he wanted a defense of factual innocence. Any type of ---- But, I mean, to follow up on Judge Smith's question, here you have a defense counsel that's so alarmed by his client that he feels he needs to hire a mental health professional to keep him calm during trial, one who meets with him over a hundred hours, and yet he doesn't consult with him about a defense, but he's disturbed enough about it that he says, I don't think I can control my client during trial. I'm not sure I've seen a case in which the defense counsel was aware of such significant emotional or mental problems that he felt he had to hire someone to deal with that, and yet not investigate. That's the troubling part. We don't know if counsel did or did not investigate. We do have, as the Court noted, 150 hours of meetings between Mr. Sully and mental health experts, and the result of that was that there was no evidence suggesting Mr. Sully was ever incompetent. All we have is the declaration of George Woods some 10 years later. That retrospective determination, based not on the contemporaneous evidence, but based on things that were done later, is simply not entitled to sufficient weight to overcome the presumption that Mr. Sully was competent to stand trial. Well, it may not, but at least the question that is we're not to that stage yet. The question is whether or not it's enough to get an evidentiary hearing on it. At which point you can cross-examine and make all the points you're making right now. Your Honor, under Schmiro v. Landrigan, we are to that stage. We are required, this Court is required, to assess whether Mr. Sully could actually meet the requirements of AEDPA before determining whether an evidentiary hearing is required. That includes both, not just adjudicating the performance prongs, but adjudicating the prejudice and the reasonableness of the California Supreme Court's decisions. And in that sense, Mr. Sully, in saying that we have to look at an evidentiary hearing before we adjudicate the merits of the claim, is putting the cart before the horse. In this particular case, the Court needs to look at whether Mr. Sully has presented sufficient evidence in front of the California Supreme Court to merit relief. He has not done so. Well, we are kind of hampered by the fact that the Supreme Court gave a lot of conclusions without adequate factual findings behind it, so that we are going back to square one, essentially. That the California Supreme Court made these findings? Yes. I mean, that's the problem. And we look through the AEDPA deference lens, of course, but when the State courts elect not to fully analyze and document their conclusions, it makes it very difficult to do that, because each side can put whatever gloss they want to on the decision of the Court. I mean, it's, you know, you can't do anything about that. You get the cards are dealt, but it's difficult from this point of view. I understand what the Court is concerned with here, but I think the concern is addressed by looking at what the California Supreme Court actually did in deciding the case on the merits. It made legal conclusions, at the very least. And that, when you look at the claim or the idea that the opinion was on the merits, could easily have been done in this particular case due to the nature of the aggravating evidence, the six dead bodies, the heads ripped off the ducks, and the ---- It doesn't take long to say that, but they didn't say that. Correct, Your Honor. But also, in looking at this case, in terms of the weakness, the equivocality of any submitted penalty phase alternative defense, in this particular case, Mr. Sully, after having said, I didn't do it, after having stood up at the reading of the guilt phase verdicts and in his most vitriolic manner told the jury, I didn't do it, you were wrong, then counsel was very limited, as the district court found, in choices. Counsel presented a defense at that point based on humanizing the defendant and based on lingering doubt. But lingering doubt, as this Court recently said in Cox, is perhaps the most powerful evidence that a defendant can present. That's essentially the only thing that may save most defendants. Well, on this point of lingering doubt, all that I saw in reading the transcript was trying to humanize him with these various people, and then in a very cursory, very short closing argument, just saying he's not a monster. Your Honor, I believe that the court actually or that the defense counsel actually used the phrase, it was either residual doubt or lingering doubt, particularly in talking about the testimony from Tina Livingston and Angel Burns. But it wasn't really forcefully developed in any way that would, once the jury had found unanimously that he was guilty, it would take something really fairly important to raise lingering doubt, and he didn't really raise it effectively at all. Well, Your Honor, I believe that was more of a factual question. Counsel believed reasonably, according, we think, that this was the best chance his client had. Same thing as in Cox, in which counsel specifically said, I didn't think that an excuse defense would work. Now, recently in Belmontes, the Supreme Court specifically said that evidence of a second murder is perhaps the most powerful, aggravating evidence imaginable. We don't have just a second murder or a third or a fourth. We have six murders. These were not isolated. This was not an isolated incident as in Cox. This was, as the Court put it, a long siege of six horrific murders. Against that, counsel's choices were limited when Mr. Sully took the stand and said, I didn't do it. An excuse defense simply wasn't going to work here. The fact that counsel has not submitted anything, in fact, counsel is deceased at this point, does not change the balance of the equation. If counsel had any evidence, if Mr. Sully had any evidence that counsel did not actually investigate this, it was his obligation to put this evidence forth in front of the California Supreme Court. He has not done that at all. Is there a shred of evidence that he did an investigation? Your Honor, in hiring Drs. Grossi and Elin, and even in hiring Dr. Cohen, we can at least assume that counsel was thinking about all possible aspects of the case. In Strickland itself, the defense attorney specifically said, I did not do any mental health investigation, because after talking to my client, I didn't think there was a problem. After Mr. Sully was examined for 150 hours by his mental health experts, granted not forensic experts, but we would submit that the difference is minimal at best because the tests were the same. After he was just there to, quote, keep the lid on, end quote, he was never asked by, as far as the record shows, to be a witness as to incompetence of Sully. Mr. Grossi, in his declaration, said that I no longer do forensic work. At the point that he was hired, he no longer did forensic work. Now, we recognize that. So isn't that the opposite of Strickland? I mean, here in this case, the defense counsel knew that he had a problem client that had some severe mental problems enough to hire somebody who was not even going to do a forensic examination, just hired to keep him calm enough so he could sit there during trial. So the red flags are up, and there's no investigation, nor do I see that he spent more than an hour or so with Mr. Grossi. Your Honor, there are two parts to that question. First, the fact that Mr. Sully was angry does not, again, show that he had mental illness, nor is there anything in Dr. Elan's report, as the district court found, that actually showed true mental impairment. Now, the second part of that, there was, we believe that there was at least a second meeting between Grossi and Dr. or between counsel and Dr. Grossi, because that is where he recommended the use of Dr. Cohen, and that was to bolster this guilt-phase defense. Again, the second mitigating factor in this particular case was residual doubt. That may not have worked here, but that is not the standard. The standard is whether counsel, given all of the circumstances that he knew he was aware of, made reasonable choices. Those choices were informed by Mr. Sully's actions and Mr. Sully's testimony, Mr. Sully's statements. In this particular case, it was reasonable for counsel to actually look at this, for counsel to present this lingering doubt evidence instead of, or lingering doubt defense, rather than to present an excuse defense that would have been duplicitous. Now, in this particular case, unlike Wiggins and Earp and all of these other cases that defense counsel cites, we have no actual new evidence. We don't have evidence of organic brain damage, even in pinholster. We don't have anything new that could have come on. All we have is a new spin from Dr. Woods, saying, I would have done this differently. I would have said X, even though your client and his expert say Y or Z. But that is not the test for whether counsel was incompetent. The question is whether counsel, given the circumstances at the time, acted reasonably. And he did. We have no evidence otherwise. I guess the worry that I have is that with the evidence we have in front of us, we have no evidence about why he did what he did. Doesn't that at least edge us to at least an evidentiary hearing? No, Your Honor. Again, the burden at this point under 2254 was on Mr. Sully long ago in 1997 to put that evidence, if it existed, in front of the California Supreme Court. Under Schriero, again, the test is not just whether Mr. Sully can make out a colorable claim on the deficient performance prong, but whether Mr. Sully can also make out a claim on the prejudice prong and can prove unreasonable application. That's all the test is. But Mr. Sully, because of the six brutal murders in this case, cannot meet that test. We note one other thing. As Belmontes suggested, that evidence of a second murder is incredibly powerful. It is the most powerful aggravating evidence imaginable. There was no evidentiary hearing in Belmontes. In this particular case, given the nature of the six brutal murders, this long siege of six horrific events, that is what prevents Mr. Sully from ever showing prejudice and that is the reason why the California Supreme Court and the district court were entitled to reject Mr. Sully's claims on the merits without resorting to an evidentiary hearing. That is why Mr. Sully has failed to show any unreasonable application under Section 2254. If this Court has no further questions, we would ask the Court affirm the judgment of the district court. Thank you, counsel. Thank you. We'll give you a couple of minutes for rebuttal, if you like. Just put two on the clock. All of the evidence that we presented to the district court, the declarations, the records, the information that is before you in the excerpts of the record, was all presented to the California Supreme Court. I want to make sure, because I'm not sure I understand what counsel was saying,  to produce that evidence back before this stage. We did produce all of that. What happened was the people who did the State court appeal, the State court appeal did not do a habeas corpus petition at all. And when I got appointed to do the Federal habeas, part of what I had to do was to, after I put together the material for the habeas, is to go back and exhaust the remedies in State court. So everything that is before you was before the State court. And I think, quite frankly, that the prosecutor is reading too much into a postcard, into a – he says it's a denial on the merits. I understand that. But no one has ever looked at the evidence to see or weighed the evidence. And frankly, I disagree with the prosecutor that the fact that these are heinous crimes means Sully never could have suffered prejudice. The logical extension of that is he doesn't get a trial. He's not deserving of a trial because there's nothing anyone can say. There's plenty we could have said. And in our reply brief, we set forth an argument based upon the facts and circumstances that we have set forth in the excerpts of records of what the closing argument to the penalty phase jury would be. And it is, in my opinion, a persuasive argument for several reasons. First, the government would not be able to come in and say there's no evidence of mental health. That's what the government argued. There's no evidence of any mental illness on behalf of Mr. Sully because there would be substantial evidence. Now, the government could say we don't believe it and put on their own experts. But that would be a credibility contest between the two sides. And that never took place. And IRP is a AEDPA case, and it stands clearly for the proposition that I cited, that if there hasn't been an evidentiary hearing in State and Federal court and we've alleged a colorable claim, which is low, both to the performance and the prejudice side, we're entitled to have an evidentiary hearing to develop the facts. So before Mr. Sully gets put to death, at least someone has developed the facts that go that were not taken care of during the trial. Thank you, counsel. Thank you. Thank you both for your arguments. I realize that our time has been limited, but your briefs have been excellent and your presentation is excellent today as well. And thank you both for your argument. The case just heard will be submitted for decision and will be in adjournment.
judges: Fletcher B. , Thomas, Smith N. R.